1  PACIFIC COAST LAW GROUP
2  MARK A. GOLOVACH (Cal. Bar No. 220760)
3  555 West 5th Street, 31st Floor
   Los Angeles, California 90013
4  Telephone: 310/684-3966
   Facsimile: 310/460-0078
5

6  *Attorneys for Plaintiff*

7

8

9

10           UNITED STATES DISTRICT COURT

11           CENTRAL DISTRICT OF CALIFORNIA

12

13  SAVARIO CIMINI, derivatively on       Case No.  **CV11 - 5120**-MRP
    behalf of MANNKIND                                         (PLAx)
14  CORPORATION,

15                          Plaintiff,    **VERIFIED SHAREHOLDER
                                          DERIVATIVE COMPLAINT**
16              vs.
                                          **JURY TRIAL DEMANDED**
17  ALFRED E. MANN, HAKAN S.
    EDSTROM, MATTHEW J.
18  PFEFFER, PETER C.
    RICHARDSON, BARRY E.
19  COHEN, RONALD CONSIGLIO,
    MICHAEL FRIEDMAN, KENT
20  KRESA, DAVID H. MACCALLUM,
    HENRY NORDHOFF, JAMES
21  SHANNON, and DOES 1-25 10
    inclusive,
22                          Defendants,

23              vs.

24  MANNKIND CORPORATION, a
    Delaware corporation,
25
                          Nominal Defendant.
26

27

28

FILED
CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES
2011 JUN 17 PM 3: 22
BY:

FILED BY FAX

## I.    OVERVIEW OF THE ACTION

1.    Plaintiff, a shareholder of MannKind Corporation ("MannKind" or the "Company"), brings this shareholder derivative lawsuit against certain officers and directors of MannKind for breaching their fiduciary duties to the Company by issuing false and misleading statements.

2.    MannKind is a biopharmaceutical company that focuses on the discovery, development and commercialization of therapeutic products for diseases such as diabetes and cancer. MannKind's lead investigational product candidate is AFREZZA, an ultra rapid-acting insulin. AFREZZA is under clinical investigation for the treatment of adults with Type 1 or Type 2 diabetes for the control of hyperglycemia.

3.    The U.S. Food and Drug Administration (the "FDA") previously delayed the approval of AFREZZA. MannKind's officers and directors represented that the delay was caused by the FDA's failure to complete its inspection of the European facility that makes the insulin used in AFREZZA. But in truth, there were questions about the clinical utility of AFREZZA.

4.    Beginning in June 2010, the Individual Defendants (as defined in ¶27 ) issued or caused the Company to issue materially false and misleading statements regarding the Company's business and prospects for AFREZZA. In particular, the Individual Defendants promoted AFREZZA for the treatment of adult patients with Type 1 and Type 2 diabetes for the control of hyperglycemia, telling the market that AFREZZA was one of the most valuable products in the history of drug making, while failing to disclose that MannKind's platform would require better information for patients about the risks of AFREZZA. Because of these false statements, MannKind's stock traded at artificially inflated prices, trading as high as $9.83 per share on January 18, 2011.

5.    On January 18, 2011, the FDA issued a response to MannKind about the Company's New Drug Application ("NDA") for AFREZZA. The FDA deferred approving AFREZZA and requested two additional clinical trials with the inhaler.

1    6.    After the market closed on January 19, 2011, the Individual Defendants

2  revealed or caused the Company to reveal the truth about AFREZZA and disclosed the

3  FDA's letter to the public.  Based on this news, MannKind's stock plummeted $2.94 per

4  share to close at $6.17 per share on January 20, 2011 – a decline of 32% in just one day.

5  The stock continued its descent, closing as low as $4.74 on February 1, 2011.

6    7.    After the market learned of the FDA's response letter, the market also

7  learned that the Individual Defendants concealed the following facts from shareholders:

8  (a) the FDA had issues with the clinical utility of AFREZZA which might inhibit

9  approval; (b) AFREZZA was a riskier product than investors were led to believe and

10  would require additional risk disclosure to patients if approved; (c) the reasons for the

11  FDA's earlier delay in approval were not limited to the inspection of the European

12  facility; and (d) given these factors, it was highly doubtful that FDA approval would be

13  forthcoming.

14    8.    Plaintiff brings this derivative action to (a) recover damages against the

15  Individual Defendants for the benefit of the Company and (b) require the Company to

16  reform and improve its corporate governance and internal procedures to protect the

17  Company and its shareholders from a repeat of the damaging events described below.

18  **II.    JURISDICTION AND VENUE**

19    9.    Jurisdiction is conferred by 28 U.S.C § 1332.  There is complete diversity

20  among the parties and the amount in controversy exceeds the sum or value of $75,000,

21  exclusive of interest and costs.

22    10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because

23  MannKind maintains its principal executive offices in this district, one or more of the

24  Individual Defendants reside in this district, a substantial portion of the transactions and

25  wrongs complained of herein – including the Individual Defendants' primary

26  participation in the wrongful acts detailed herein – occurred in this district, and the

27  Individual Defendants have received substantial compensation in this district by doing

28  business here and engaging in numerous activities that had an effect in this district.

2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

III.   **THE PARTIES**

    A.   **Plaintiff**

    11.   Plaintiff Savario Cimini ("Plaintiff") is a current shareholder of MannKind, was a shareholder of MannKind at the time of the transactions and events complained of herein, and has continuously held the stock.  Plaintiff is a citizen of Nevada.

    B.   **Nominal Defendant MannKind**

    12.   Nominal Defendant MannKind is a Delaware corporation with its company headquarters at 28903 North Avenue Paine, Valencia, California 91355.  As of April 21, 2010, MannKind had approximately 113,454,807 outstanding shares.  MannKind is traded on the NASDAQ under the ticker symbol "MNKD."

    C.   **Individual Defendants**

    13.   Defendant Alfred E. Mann ("Mann") has been a director since April 1999, the Chairman of the Board since December 2001, and the Chief Executive Officer since October 2003.  He is also the Company's founder and a majority shareholder.  Upon information and belief, Mann is a citizen of California.

    14.   Defendant Hakan S. Edstrom ("Edstrom") has been the President and Chief Operating Officer since April 2001 and has served as a director since December 2001.  Upon information and belief, Edstrom is a citizen of California.

    15.   Defendant Matthew J. Pfeffer ("Pfeffer") has been the Company's Chief Financial Officer and Corporate Vice President since April 2008.  After MannKind received the FDA's response letter but before MannKind disclosed the letter to the public, Pfeffer sold 6,300 shares of his personally held MannKind stock.  Upon information and belief, Pfeffer is a citizen of California.

    16.   Defendant Peter C. Richardson ("Richardson") has been the Company's Chief Scientific Officer and Corporate Vice President since October 2005.  Upon information and belief, Richardson is a citizen of New Jersey.

/ / /

/ / /

3

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    17.    Defendant Barry E. Cohen ("Cohen") has served as a director of the
2  Company since May 2007.  Upon information and belief, Cohen is a citizen of New
3  York.

4    18.    Defendant Ronald Consiglio ("Consiglio") has served as a director of the
5  Company since October 2003.  He is the Chairman of the Audit Committee.  Upon
6  information and belief, Consiglio is a citizen of California.

7    19.    Defendant Michael Friedman ("Friedman") has served as a director since
8  December 2003.  Upon information and belief, Friedman is a citizen of California.

9    20.    Defendant Kent Kresa ("Kresa") has served as a director since June 2004.
10  Upon information and belief, Kresa is a citizen of California.

11    21.    Defendant David H. MacCallum ("MacCallum") has been a director since
12  June 2004.  He is a member of the Audit Committee.  Upon information and belief,
13  MacCallum is a citizen of New York.

14    22.    Defendant Henry L. Nordhoff ("Nordhoff") has been a director since March
15  2005.  He is a member of the Audit Committee.  Upon information and belief, Nordhoff
16  is a citizen of California.

17    23.    Defendant James S. Shannon ("Shannon") has been a director since
18  February 2010.  Upon information and belief, Shannon is a citizen of Pennsylvania.

19    24.    Mann, Edstrom, Cohen, Consiglio, Friedman, Kresa, MacCallum, Nordhoff,
20  and Shannon are sometimes referred to herein as the "Director Defendants."

21    25.    Mann, Edstrom, Pfeffer, and Richardson are sometimes referred to herein as
22  the "Officer Defendants."

23    26.    Consiglio, MacCallum, and Nordhoff are sometimes referred to herein as
24  the "Audit Committee Defendants."

25    27.    The Director Defendants, the Officer Defendants, and the Audit Committee
26  Defendants are sometimes referred to as the "Individual Defendants."

27    28.    The true names and capacities of Defendants sued herein as Does 1 through
28  25, inclusive, are presently not known to Plaintiff, who therefore sues these Defendants

4

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  by such fictitious names. Plaintiff will seek to amend this Complaint to include these

2  Doe Defendants' true names and capacities when they are ascertained. Each of the

3  fictitiously named Defendants is responsible in some manner for the conduct alleged

4  herein and for the injuries suffered by MannKind as a result of Defendants' wanton and

5  illegal conduct.

6  **IV.   SUBSTANTIVE ALLEGATIONS**

7      **A.   Background**

8      29.   MannKind is a biopharmaceutical company focused on the discovery,

9  development and commercialization of therapeutic products for diseases, such as

10 diabetes and cancer. The Company's stock traded largely on the prospects of its lead

11 product candidate, AFREZZA (insulin human [rDNA origin]) Inhalation Powder for the

12 treatment of adult patients with Type 1 and Type 2 diabetes for the control of

13 hyperglycemia, a rapid-acting insulin that had completed clinical trials for the treatment

14 of diabetes in the United States, Europe, and Japan. AFREZZA utilizes Technosphere

15 formulation technology, which is based on a class of organic molecules that are designed

16 to self-assemble into small particles onto which drug molecules can be loaded. With

17 AFREZZA, the Company loads recombinant human insulin onto the Technosphere

18 particles.

19     30.   A prior inhaled insulin formulation, Exubera, had been approved but had

20 not been successful. Pfizer, Inc. had invested $2.8 billion in Exubera but it was not

21 widely accepted due to the awkward nature of the inhaler. Due to the inconvenience,

22 both doctors and patients were not enthusiastic and Pfizer ultimately pulled Exubera

23 from the market. AFREZZA was considered more convenient than Exubera. Thus,

24 assuming it was approved, MannKind was able to generate substantial investor

25 enthusiasm for the product.

26     31.   On March 16, 2009, MannKind issued a press release announcing that it

27 had submitted an NDA to the FDA for approval of then-called "AFRESA® (insulin

28 monomer human [rDNA origin]) Inhalation Powder and the AFRESA® Inhaler for the

5

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

treatment of adults with type 1 or type 2 diabetes mellitus for the control of hyperglycemia." The Company's NDA was based on a clinical program involving 44 completed studies and five ongoing studies upon its submission to the FDA. The release stated in part:

> We are delighted to have reached this important milestone, said Alfred Mann, Chairman and Chief Executive Officer of MannKind Corporation. This NDA submission is the culmination of years of clinical research that has supported our long-held belief that AFRESA will be a first-in-class ultra rapid-acting insulin with the potential to change the way diabetes is treated.

32.    In January 2010, the FDA had delayed approval of AFREZZA. MannKind had represented the delay was due to the FDA's mistake in not completing an inspection of the European facility that makes the insulin used in AFREZZA. In fact, there were questions about the clinical utility of AFREZZA.

33.    On June 9, 2010, Defendant Pfeffer appeared at the Needham & Company Healthcare Conference and stated the following:

> Overall safety, I think this is becoming less of a story as time goes on and as people start to understand the product and it doesn't have some of the issues that were hypothecated for a predecessor product, but it has been very extensively studied, *we don't have safety issues*.
>
> *       *       *
>
> We do have – that we talked about earlier, a small non-progressive and clinically insignificant change in pulmonary function. But we offset these with other benefits like reduction in hypoglycemic risk. We have demonstrated

6

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      no increase in cardiovascular risk, this has been very

2      important in diabetes products, and has been a hang-up for

3      some, not so much because they have a cardiovascular risk,

4      but more often they didn't have a big enough study to

5      demonstrate that they didn't and the FDA started requiring

6      this a couple of years ago. Happily our studies were large

7      enough that we could show essentially no risk whatsoever.

**B.    The Individual Defendants' False And Misleading Statements**

34.    On June 24, 2010, the Individual Defendants caused the Company to issue a press release announcing that the "American Diabetes Association/The Lancet Symposium Will Highlight Study Showing AFREZZA® Provides Comparable Glycemic Control with Less Weight Gain and Hypoglycemia than Standard of Care." The release stated:

> We are honored that the ADA and *TheLancet* chose to
> spotlight AFREZZA data at this special symposium, said
> Dr. Peter Richardson, MRCP, Corporate Vice President and
> Chief Scientific Officer, MannKind Corporation.  Their
> recognition validates our enthusiasm for AFREZZA's
> potential to be an important new therapeutic option in the
> management of diabetes.

35.    Following this release, Defendants Richardson and Mann participated in the Wells Fargo Securities Healthcare Conference on June 24, 2010. During the conference, they stated the following:

> [RICHARDSON:]  But in terms of where we are with the
> response to the Complete Response letter, there were three
> areas which I think we've shared very clearly in terms of
> that. One was the question of clinical utility, and we all had

7

1    a question in terms of exactly what was meant by clinical

2    utility. I think when we substitute that, indeed I talked in

3    terms of some other unusual phase to the use in terms of —

4    especially when discussing something such as insulin, we

5    know it's got established efficacy. We know that we have

6    demonstrated in two placebo-controlled studies that we

7    have differentiation from that. ***So the question of efficacy***

8    ***really isn't there***.

9                        *        *        *

10   The clinical utility question I think has really been very

11   much helped by [Study] 117 and also by the discussion that

12   we had. Bioequivalence very clearly demonstrates now in

13   an assay that needs exactly those requirements and also at

14   the moment what we've done is we're actually showing

15   they are the same. And we also have a very good

16   understanding of how to take that data set and move it to

17   the device which I think it really means benefits to the

18   patients in obvious ways, improves on what we already

19   have and that's the dialogue that we're now in.

20

21                       *        *        *

22   [ANALYST:] And I take it from — given the fact that you

23   hadn't really put out a separate press release about the FDA

24   meeting that there wasn't anything that was unexpected like

25   additional clinical studies or anything out of the

26   extraordinary that came out of that meeting?

27

28

                                8
─────────────────────────────────────────────
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

[MANN:] *The meeting was very – seemed to be very supportive*. I wasn't there, but the reports from our team – Peter should really answer this, he was at the meeting, but it was a very good meeting. Peter?

[RICHARDSON:] Yeah, I think, I'm the only person in the room that was present at the meeting. *And I would describe it as a very productive meeting*. To me the questions have been those which we've describe[d] in terms of clinical utility and bioequivalence and the technical challenge in making that transference. We clearly, really saw great understanding of where we were with the dataset in terms of discussions around clinical utility, understanding what that was and a discussion around 117 in terms of the importance of the bioequivalence. Again, being able to reach agreement and say well, yes we're doing the assays your way and our way always makes a much easier discussion.

*    *    *

Well actually, referring to . . . something that Al said earlier on is that, when people have a clear understanding of the pharmacokinetics and the pharmacodynamics of our products, then the comparison to an Exubera or other inhalable type of products really ends there. So I'd have to say that while there is an understanding from the partnership discussions that we've had, that, yes there is an educational phase of the introduction of this product, it's not just a pill that you swallow and suddenly it happens.

9

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      People need to understand the benefits and how to use the

2      product, but I'm very confident and particularly based on

3      the results that we've seen from the discussions with the

4      FDA now on June 9, in terms of a very strong label

5      particularly in regards to weight neutrality, lack of

6      hypoglycemia that's exciting partners and we see that as a

7      very, very strong label. So I would say with a good

8      understanding of the product, we'd certainly overcome

9      some of those initial perceptions.

10

                   *     *     *

11

12    [MANN:] By the way, the perception, if you look at serious

13    market surveys done by professionals, we don't see the

14    problem as being very significant. The trial or the survey

15    we did last year came out about 25% of American

16    physicians, both about evenly split between PCPs and

17    endos. About 25% would recommend this product for their

18    patients. And they showed that within 12 months over 90%

19    of the patient population would be recommended for this

20    product. Just yesterday there was a publication by one of

21    the investment banking firms and analysts who surveyed

22    100 patients and got a 15% interest in the product. And I

23    might add that the trial – this study we did last year, we

24    also did studies in the five major European markets and

25    found comparable or even better results in most of the

26    countries.

27

28

10

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    36.    On June 26, 2010, the Individual Defendants caused the Company to issue a

2  press release announcing that data on AFREZZA was presented at the American

3  Diabetes Association's 70th Scientific Sessions.  The release stated in part:

> The proper control of endogenous blood sugar after meals
> is crucial to the successful management of patients with
> Type 2 diabetes, and our findings show that AFREZZA
> achieves this goal more rapidly than standard therapy with
> insulin lispro, said Dr. Peter Richardson, MRCP, Corporate
> Vice President and Chief Scientific Officer, MannKind
> Corporation.  Additionally, the finding that the effect of
> AFREZZA on free fatty acids and glucagon was dose-
> dependent may be very important in understanding the
> consistent effect that we see with AFREZZA on fasting
> glucose levels. Free fatty acids play a major role in the
> pathophysiology of insulin resistance, and we anticipate
> conducting further research in this area.

>              *     *     *

> AFREZZA™ is a novel, ultra rapid acting mealtime insulin
> therapy being developed by MannKind Corporation for the
> treatment of adult patients with Type 1 and Type 2 diabetes
> for the control of hyperglycemia. It is a drug-device
> combination product, consisting of AFREZZA Inhalation
> Powder pre-metered into single use dose cartridges and the
> light, discreet and easy-to-use AFREZZA Inhaler.
> Administered at the start of a meal, AFREZZA dissolves
> immediately upon inhalation and delivers insulin quickly to
> the blood stream. Peak insulin levels are achieved within 12

11

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1       to 14 minutes of administration, mimicking the release of

2       meal-time insulin observed in healthy individuals. To date,

3       the AFREZZA clinical program has involved more than 50

4       different studies and over 5,000 adult patients.

5

       *Study Design and Key Findings*

6

       Single doses of 60U and 90U AFREZZA were compared

7

       with 10 IU subcutaneous lispro insulin in an open-label,

8

       two-way crossover study incorporating a meal challenge

9

       (BoostPlus® 12 fl oz enriched with [U-13C]glucose) in

10

       insulin-treated subjects with Type 2 diabetes and normal

11

       pulmonary function.

12

13     37.    On July 20, 2010, the Individual Defendants caused the Company to issue a

14 press release announcing that the FDA had accepted the Company's resubmission of its

15 NDA for AFREZZA, classifying it as a Class 2 resubmission. The action date set by the

16 FDA would be December 29, 2010. The release stated in part:

17       We have worked diligently since March to prepare our

18       resubmission and we are confident that we have addressed

19       the requests that were outlined by the FDA, said Alfred

20       Mann, Chairman and Chief Executive Officer. We will

21       continue to work closely with the FDA during this final

22       stage of the review process. We firmly believe AFREZZA

23       has the potential to address a poorly-met need in diabetes

24       therapy. Our primary goal is to make this novel therapeutic

25       option available to patients as soon as possible.

26

27 ///

28 ///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

38.    On August 2, 2010, the Individual Defendants caused the Company to issue a press release announcing its second quarter 2010 financial results. The release stated in part:

> For the second quarter of 2010 total operating expenses were $37.4 million, compared to $53.4 million for the second quarter of 2009, a decrease of $16.0 million. Research and development (R&D) expenses were $26.2 million for the second quarter of 2010 compared to $39.8 million for the same quarter in 2009, a decrease of $13.7 million. This 34% decrease in R&D expense was primarily due to reduced costs associated with the clinical development of AFREZZA(TM) after the submission of its NDA in March 2009.
>
> *        *        *
>
> The second quarter was particularly busy, as we prepared for our meeting with the FDA and then submitted our response to the agency's Complete Response letter of March 2010, said Alfred Mann, Chairman and Chief Executive Office of MannKind Corporation. With a Class 2 designation for this resubmission, our focus for the next six months will be to work closely with the FDA as it evaluates our next-generation delivery system and the other information that we provided in our resubmission. In the coming months, we will also initiate the installation and validation of equipment for the new device in our Danbury, Connecticut manufacturing facility. Everyone at MannKind

13

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    is committed to the goal of making AFREZZA available to

2    patients as soon as possible.

3
4    39.    Following the release, MannKind hosted a conference call for analysts,

5    investors and media representatives, during which Defendant Richardson stated the

     following:
6
7    To remind you, there were three substantive areas to which

8    the Agency raised questions. Clinical utility, or where does

9    the project and the product fit into the therapeutic

     complementarian with patients' [sic] with diabetes; the
10
11   assay methodology used in our studies to demonstrate the

12   bioequivalence of the inhaler used in our pivotal clinical

13   studies and that to be marketed; and finally, the technical

14   aspects of the requirements of the device such as how often

15   is it changed and how we mark the amount of [inaudible]

16   identify each cartridge.

17   As we indicated to you in our previous updates, we are

18   confident that we will be able to test these on the basis of

19   the data we already had available, or were in the process of

20   generating as part of our previously agreed development of

21   our next-generation device, formerly known internally as

22   Dreamboat.

23
24   We were able to have a very helpful and productive

     discussion in the meeting with the Agency on June 9,
25
     during which we were able to establish . . . what data would
26
     be sufficient for them to resume the review based upon the
27
     additional clinical data from Study 117.
28

14

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1                              *      *      *

2          I am delighted with my team's performance in responding

3          so rapidly to the questions and feel that we have a strong

4          set of answers. Furthermore, I'm pleased that we're now on

5          course for launch with [a] next-generation device which

6          offers such significant benefits. The new device and the

7          studies are able to address the technical aspects of the

8          complete response. It's clear that this evolution is the

9          optimal approach of bringing [AFREZZA] to market in the

10         most effective way and the shortest possible timeframe. In

11         order to do this we have in essence simplified the old

12         device to its very basics and have not changed in any way

13         the powder formulation or the amount of fine particles

14         absorbed.

15

16         40.    On August 19, 2010, the Individual Defendants caused the Company to

17  announce pricing of a secondary offering of $100 million aggregate principal amount of

18  Senior Convertible Notes.  The Company expected to use the net proceeds of the

19  offering in order to fund costs of its clinical trials programs and other research and

20  development activities, to expand its manufacturing operations, both on-going and

21  planned, and for general corporate purposes, including working capital.

22         41.    On September 13, 2010, Defendants attended the Morgan Stanley Global

23  Healthcare Conference call for analysts, media representatives and investors, during

24  which Mann represented the following:

25         Well, we've done extensive preclinical studies over 50

26         trials in over 5,000 patients, some of the patients have been

27         on our therapy for over 5 years. At the end of the day, we

28         have seen absolutely no impact on lung tissue. We've seen

                                   15
          VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1                 no increase in risk of cardiovascular problems or of cancer

2                 and there have been no safety signals. The FDA has raised

3                 not a single safety concern related to AFREZZA. Now all

4                 that said, at the end of the day, we really truly believe that

5                 AFREZZA is very safe, actually reduces the risk of . . .

6                 short-term safety because you don't have the extent of

7                 hypoglycemia that you have with other drugs. And we

8                 believe you'll be able to get fasting levels down to a point

9                 where you get better A1cs to lower long-term safety

10              concerns as well and we see no other issues evolve. We

11              have no safety signals of any kind.

12

13     42.    On September 14, 2010, Defendant Edstrom appeared at the Robert W.

14 Baird & Co., Inc. Health Care Conference and represented the following:

15              So AFREZZA, we call it the next-generation insulin. So

16              why is it a next-generation insulin? Well, it is for right now

17              at least the first and only ultra-rapid-acting insulin that is up

18              for FDA review with the PDUFA date scheduled for

19              December 29 of this year.

20                                *      *      *

21

22              In terms of pulmonary functions, we have seen very little

23              effect of pulmonary function, and actually it's probably

24              more a little bit of the reaction to the powder. If it stops it

25              always comes back and the difference is, as one doctor

26              said, . . . basically the difference . . . between pulmonary

27              function [in] an 80-year old and an 81-year old person. So

28              it really is non-significant in terms of effect.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Safety, we have studied AFREZZA very extensively from a

2    safety point of view, particularly because it's combined

3    with the FDKP, or the Technosphere, which is a new

4    compound that the FDA had . . . not seen before.

5

6    43.    On October 29, 2010, the Individual Defendants caused the Company to

7    issue a press release announcing its third quarter 2010 financial results. The release

8    stated in part:

9    For the third quarter of 2010 total operating expenses were

10    $42.5 million, compared to $42.8 million for the third

11    quarter of 2009, a decrease of $0.3 million. Research and

12    development (R&D) expenses were $31.4 million for the

13    third quarter of 2010 compared to $30.5 million for the

14    same quarter in 2009, an increase of $0.9 million. This 3%

15    increase in R&D expense was primarily due to increased

16    raw material purchases in the third quarter of 2010 offset

17    by decreased costs associated with the clinical development

18    of AFREZZA® after the submission of its new drug

19    application (NDA) in March 2009.

20                    *       *       *

21

22    During this past quarter we were primarily focusing on

23    preparations for commercial readiness and for an

24    AFREZZA partnership, said Alfred Mann, Chairman and

25    Chief Executive Officer. In addition, we executed a multi-

26    part strategy in which we added close to $100 million from

27    an offering of convertible notes and put in place a series of

28    equity sales intended to raise additional funds over the next

17

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

year, provided our stock price exceeds the floor price that we set. Finally, paralleling that transaction we also established a mechanism, which is now being executed, to retire a portion of the debt under The Mann Group loan agreement.

44.    After releasing its third quarter 2010 results on October 29, 2010, MannKind hosted a conference call for analysts, media representatives and investors, during which Defendant Mann represented the following:

We are continuing to work collaboratively with the agency to support their review of our resubmission. Even before approval on a partnership, it is important that we begin planning for commercialization of the AFREZZA system. MannKind must therefore increase that focus and begin to plan for the launch. ***Our goal is to secure a global partnership with a major company and such discussions with a number of potential partners are moving forward.*** However, as Hakan noted, we do not expect to reach closure until after the label is finalized. That said, we cannot comment further on a partnership until it is appropriate to announce a definitive agreement. In the meantime, we are preparing for commercial readiness. The first of the new commercial filling and packaging machines that will be used with the AFREZZA Inhalation system was delivered to our Danbury, Connecticut factory in August.

\*    \*    \*

18

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    AFREZZA is well tolerated and *we've not identified any*

2    *safety signal*, though we will not recommend it for patients

3    with compromised lung function.

4

5    45.    On December 28, 2010, the Individual Defendants caused the Company to

6    issue a press release announcing that the Company had received notification from the

7    FDA that it was unable to complete the review of the NDA for AFREZZA by the action

8    date of December 29, 2010.  The FDA stated it would require an additional four weeks

9    to complete its review.

10    46.    On January 12, 2011, MannKind participated at the JP Morgan Healthcare

11    Conference during which Defendant Mann stated:

12    Our product AFREZZA addresses this market.  We think

13    it's a blockbuster or even super blockbuster potential.  It's

14    addressing an enormous opportunity and it really addresses

15    the problems with the current insulins very effectively.  It's

16    a first in a new class of insulins, which we call ultra-rapid

17    acting insulins.  They're delivered through a very

18    convenient easy to use inhalation system.

19

20    *    *    *

21    We've studied this in an enormous number of trials, over

22    50 trials, well over 5,000 patients and we've not seen a

23    single safety signal. . . .

24    We do see a very tiny amount of clinically insignificant

25    reduction in pulmonary function.  In our trials we saw this,

26    with a new inhaler . . . we see virtually none.  The reason for

27    the difference is part of the problem with the old inhalers,

28

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

there was a few particles of where there was aggregation of the particles and that sort of reached cough center and also people reacted to it. But we're seeing much less, almost no effect on pulmonary function, whatever it was, even before it was non-progressive and after you stop using it, it recovered quickly.

\*     \*     \*

We got a submission we did in March 16 of 2009. In March 12 of 2010, we got a CRL, and we had a meeting with the agency on June 9th of last year, and then we refiled a resubmission in 2010, which was accepted by the agency as a complete response on, and we're expecting the action date on December 29th. On the 27th, they called and said they needed about another four weeks to complete their work. So we're cautiously optimistic, but one never knows, you can never predict the action of the agency.

We're moving now towards preparation for launch. We've installed a new equipment for filling and finishing the new cartridge for the new inhaler that was received in August, a very interesting machine. Those of you who really are interested perhaps should go out and visit the factory and see it, see the whole systems. A very fine factory, we – that one of the pharmaceutical manufacturing organizations gives five awards out every summer, and the – for I think the only time they've ever done it they gave two of the

20

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    awards for us, for our factory, really quite an impressive

2    factory, you ought to take a look at it.

3                        *        *        *

4

5    We think it has blockbuster potential with AFREZZA, it's a

6    large and unmet medical need and in an epidemic, is out of

7    control, it's unique technology, it's a whole new class of

8    insulin that addresses the issues with other insulins and will

9    frankly provide better therapy in my opinion than most of

10    the other oral drugs and other alternative therapies that are

11    there and they are only really there because . . . current

12    insulins are not adequate, mostly prandial insulins, I should

13    say. It's an easy system to use very simple and we expect

14    approval soon and certainly FDA action.

15

16    47.    Following these statements, MannKind's stock increased from $8.71 per

17    share on January 11, 2011 to $9.40 per share by January 13, 2011.

18    48.    On January 18, 2011, MannKind received notice that the FDA had

19    requested two additional clinical trials with its inhaler, such that approval would be

20    much later than represented. MannKind waited until the next day to disclose this notice.

21    Because of this non-disclosure, MannKind's stock traded above $10 per share on

22    January 18, 2011. Also on January 18, 2011, Defendant Pfeffer, the Company's CFO,

23    sold 6,300 shares of his own MannKind stock for $10.00 per share.

24    49.    Then, on January 19, 2011, shortly before the market closed, the Individual

25    Defendants caused the Company to issue a press release entitled "MannKind

26    Corporation Receives Complete Response Letter from the FDA for AFREZZA®,"

27    which stated in part:

28    / / /

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    MannKind Corporation today announced that it has
2    received a complete response letter from the U.S. Food &
3    Drug Administration (FDA) regarding the New Drug
4    Application (NDA) for AFREZZA® (insulin human
5    [rDNA origin]) Inhalation Powder for the treatment of adult
6    patients with type 1 and type 2 diabetes for the control of
7    hyperglycemia.

8    A complete response letter is issued by the FDA's Center
9    for Drug Evaluation and Research when the review of a file
10   is completed and questions remain that preclude the
11   approval of the NDA in its current form.

13   The principal issue raised by the FDA concerned the usage
14   of *in vitro* performance data and clinical pharmacology data
15   to bridge MannKind's next-generation inhaler to the phase
16   3 trials conducted using its MedTone® inhaler. The FDA
17   has requested that MannKind conduct two clinical trials
18   with the next-generation inhaler (one in patients with type 1
19   diabetes and one in patients with type 2 diabetes), with at
20   least one trial including a treatment group using the
21   MedTone inhaler in order to obtain a head-to-head
22   comparison of the data for the two devices. In the complete
23   response letter, the FDA stated that after an adequate
24   titration of study medication there should be at least twelve
25   weeks of relatively stable insulin dosing at the end of the
26   treatment period.

27
28

22

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The FDA has also requested additional information concerning the performance characteristics, usage, handling, shipment and storage of the next-generation device, an update of safety information related to AFREZZA as well as information on proposed user training and changes to the proposed labeling of the device, blister pack, foil wrap and cartons.

As we reported last fall, we have already begun a series of studies of the next-generation device in patients with type 1 (Affinity 1) and type 2 (Affinity 2) diabetes, said Alfred Mann, Chairman and Chief Executive Officer of MannKind Corporation. Consistent with the direction we received in the complete response letter, these trials are designed to focus on careful titration of insulin dose and include at least twelve weeks of stable dosing. We plan to meet with the agency as quickly as possible in order to be confident that these trials, with appropriate modifications to incorporate a comparison to the MedTone device, will suffice in addressing the agency's questions about patient use and robustness of the next-generation device.

50.     One analyst noted: "Unfortunately, MannKind was unable to provide color on timing of trial completion or (US application) resubmission or strategies to continue financing the company with cash only through" last year's third quarter.

51.     Another analyst firm, Hapoalim Securities, noted that:

As expected, the FDA gave Afrezza its second Complete Response Letter in 12 months.  MannKind stated that the principal issue raised by the FDA concerned the usage of in

23

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   vitro performance data and clinical pharmacology data to
2   bridge MannKind's next-generation (Dreamboat) inhaler to
3   the Phase 3 trials conducted using its MedTone inhaler.
4   The FDA has requested that MannKind conduct two
5   clinical trials with Dreamboat (one in patients with type 1
6   diabetes and one in patients with type 2 diabetes), with at
7   least one trial including a treatment group using the
8   MedTone inhaler in order to obtain a head-to-head
9   comparison of the data for the two devices. In the complete
10  response letter, the FDA stated that after an adequate
11  titration of study medication there should be at least twelve
12  weeks of relatively stable insulin dosing at the end of the
13  treatment period. We think these requests delay Afrezza at
14  least another 18 months, which we think is extremely
15  problematic considering the company only has funding into
16  3Q11. *We remain unconvinced that the FDA will ever*
17  *approve the product and reiterate our SELL rating and $1*
18  *Price Target*.

20  52.    On this news, MannKind's stock plunged $2.94 per share to close at $6.17
21  per share on January 20, 2011, a one-day decline of 32% on volume of over 34 million
22  shares.

23  53.    The true facts, which were known by the Individual Defendants were as
24  follows:

25          (a)    The Company failed to disclose that the FDA had
26  issues with the clinical utility of AFREZZA which might inhibit approval;
27  ///
28  ///

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1               (b)    AFREZZA was a riskier product than investors were
2 led to believe and would require additional risk disclosure to patients if
3 approved;

4               (c)    The reasons for the FDA's earlier delay in approval
5 were not limited to the inspection of the European facility; and

6               (d)    Given these factors, it was highly doubtful that FDA
7 approval would be forthcoming.

8 **V.   INSIDER SELLING ALLEGATIONS**

9     54.    Defendant Pfeffer made good use of his inside knowledge that MannKind
10 received a notice from the FDA on January 18, 2011. Although MannKind waited until
11 the next day to disclose this notice, Pfeffer sold 6,300 shares of his own MannKind stock
12 for $10.00 per share on January 18, 2011.

13     55.    Pfeffer's sales of MannKind stock were made on the basis of material,
14 nonpublic information such that Pfeffer received a material benefit that other
15 shareholders did not receive.

16 **VI.   DUTIES OF THE INDIVIDUAL DEFENDANTS**

17     **A.   Fiduciary Duties**

18     56.    By reason of their positions as officers, directors and/or fiduciaries of
19 MannKind and because of their ability to control the business and corporate affairs of
20 MannKind, the Individual Defendants owed the Company and its shareholders fiduciary
21 obligations of trust, loyalty, good faith, and due care, and were and are required to use
22 their utmost ability to control and manage MannKind in a fair, just, honest, and equitable
23 manner. The Individual Defendants were and are required to act in furtherance of the
24 best interests of MannKind and its shareholders so as to benefit all shareholders equally
25 and not in furtherance of their personal interest or benefit.

26     57.    Each director and officer of the Company owes to MannKind and its
27 shareholders the fiduciary duty to exercise good faith and diligence in the administration
28 of the affairs of the Company and in the use and preservation of its property and assets,

25

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   and the highest obligations of fair dealing. In addition, as officers and/or directors of a
2   publicly held company, the Individual Defendants had a duty to promptly disseminate
3   accurate and truthful information with regard to the Company's operations, performance,
4   management, projections, and forecasts so that the market price of the Company's stock
5   would be based on truthful and accurate information.

6   **B.    Audit Committee Duties**

7   58.    In addition to these duties, the Audit Committee Defendants owed specific
8   duties to MannKind under the Audit Committee's Charter in fulfilling the Board's
9   oversight responsibilities with respect to the Company's corporate accounting and
10  financial reporting processes, the systems of internal control over financial reporting and
11  audits of financial statements as well as the quality and integrity of the Company's
12  financial statements and reports. In particular, the Audit Committee's Charter provided
13  as follows:

14  **RESPONSIBILITIES**

15  **9.    *Quarterly Results.*** To review with management and
16  the Auditors, as appropriate, the results of the Auditors' review of
17  the Company's quarterly financial statements prior to public
18  disclosure of quarterly financial information, if practicable, or
19  filing with the Securities and Exchange Commission of the
20  Company's Quarterly Report on Form 10-Q, and any other
21  matters required to be communicated to the Committee by the
22  Auditors under standards of the Public Company Accounting
23  Oversight Board (United States).

24
25  **10.    *Management's Discussion and Analysis.*** To review
26  with management and the Auditors, as appropriate, the
27  Company's disclosures contained under the caption
28  "Management's Discussion and Analysis of Financial Condition

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and Results of Operations" in its periodic reports to be filed with the Securities and Exchange Commission.

11.     **Press Releases.**  To review with management and the Auditors, as appropriate, earnings press releases.

12.     **Accounting Principles and Policies.**  To review with management and the Auditors significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles (**"GAAP"**) related to material items discussed with management and any other significant reporting issues and judgments.

13.     **Risk Assessment and Management.**  To review with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.

***

18.     **Internal Control Over Financial Reporting.**  To confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of the Company's internal control over financial reporting, including any special audit steps taken in the event of material control deficiencies, the responsibilities, budget and staff of the internal audit function and

27

the appointment or replacement of the senior internal audit executive or manager.

\*\*\*

22.  **Ethical Compliance.**  To review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules as well as to its Code of Ethical, including review and approval of every transaction with a related person that must be disclosed by the Company pursuant to Item 404(a) of Regulation S-K of the Securities and Exchange Commission.

C.    **Control, Access, and Authority**

59.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of MannKind, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by MannKind.

60.    Because of their advisory, executive, managerial, and directorial positions with MannKind, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of MannKind, including information regarding the FDA's evaluation of AFREZZA.

61.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MannKind, and was at all times acting within the course and scope of such agency.

D.    **Reasonable and Prudent Supervision**

62.    To discharge their duties, the officers and directors of MannKind were required to exercise reasonable and prudent supervision over the management, policies, practices and internal controls of the Company. By virtue of such duties, the officers and directors of MannKind were required to, among other things:

28

1           (a)    refrain from acting upon material inside corporate
2 information to benefit themselves;

3           (b)    ensure that the Company complied with its legal
4 obligations and requirements, including acting only within the scope of its legal
5 authority and disseminating truthful and accurate statements to the investing
6 public;

7           (c)    conduct the affairs of the Company in an efficient,
8 business-like manner so as to make it possible to provide the highest quality
9 performance of its business, to avoid wasting the Company's assets, and to
10 maximize the value of the Company's stock;

11           (d)    properly and accurately guide investors and analysts
12 as to the true financial condition of the Company at any given time, including
13 making accurate statements about the Company's financial results;

14           (e)    remain informed as to how MannKind conducted its
15 operations, and, upon receipt of notice or information of imprudent or unsound
16 conditions or practices, make reasonable inquiry in connection therewith, and
17 take steps to correct such conditions or practices and make such disclosures as
18 necessary to comply with securities laws; and

19           (f)    ensure that MannKind was operated in a diligent,
20 honest, and prudent manner in compliance with all applicable laws, rules, and
21 regulations.

22 **VII. BREACHES OF DUTIES**

23     63.    The conduct of the Individual Defendants complained of herein involves a
24 knowing and culpable violation of their obligations as directors and officers of
25 MannKind, the absence of good faith on their part, and a reckless disregard for their
26 duties to MannKind and its shareholders that the Individual Defendants were aware or
27 should have been aware posed a risk of serious injury to MannKind.

28 / / /

1    64.    The Individual Defendants each breached their duty of loyalty and good

2  faith by allowing Defendants to cause, or by themselves causing, the Company to make

3  false and/or misleading statements and/or failing to disclose that: (1) the FDA had issues

4  with the clinical utility of AFREZZA which might inhibit approval; (2) AFREZZA was

5  a riskier product than investors were led to believe and would require additional risk

6  disclosure to patients if approved; (3) the reasons for the FDA's earlier delay in approval

7  were not limited to the inspection of the European facility; and (4) given these factors,

8  the Individual Defendants knew it was highly doubtful that FDA approval would be

9  forthcoming.   As a result, MannKind has expended, and will continue to expend,

10  significant sums of money to rectify the Individual Defendants' wrongdoing.

11  **VIII. CONSPIRACY, AIDING AND ABETTING, AND CONCERTED
       ACTION**

12

13    65.    In committing the wrongful acts alleged herein, the Doe Defendants and the

14  Individual Defendants have pursued, or joined in the pursuit of, a common course of

15  conduct, and have acted in concert with and conspired with one another in furtherance of

16  their wrongdoing. The Doe Defendants and the Individual Defendants further aided and

17  abetted and/or assisted each other in breaching their respective duties.

18    66.    During all times relevant hereto, the Doe Defendants and the Individual

19  Defendants collectively and individually initiated a course of conduct that was designed

20  to and did conceal the fact that: (1) the FDA had issues with the clinical utility of

21  AFREZZA which might inhibit approval; (2) AFREZZA was a riskier product than

22  investors were led to believe and would require additional risk disclosure to patients if

23  approved; (3) the reasons for the FDA's earlier delay in approval were not limited to the

24  inspection of the European facility; and (4) given these factors, the Individual

25  Defendants knew it was highly doubtful that FDA approval would be forthcoming.  In

26  furtherance of this plan, conspiracy, and course of conduct, the Doe Defendants and the

27  Individual Defendants collectively and individually took the actions set forth herein.

28  / / /

67.    The Doe Defendants and the Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. The purpose and effect of the Doe Defendants and the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) disguise the Individual Defendants' violations of law, including breaches of fiduciary; and (ii) disguise and misrepresent the Company's future business prospects.

68.    The Doe Defendants and the Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Doe Defendants and the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

69.    Each of the Doe Defendants and the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each of the Doe Defendants and the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IX.    DAMAGES TO MANNKIND

70.    As a result of the Doe Defendants and the Individual Defendants' wrongful conduct, MannKind disseminated false financial statements which failed to disclose issues with AFREZZA and the FDA's evaluation of the product. The improper statements have devastated MannKind's credibility. MannKind is now the subject of a class action lawsuit, alleging violations of securities laws in connection with the improper reporting, false statements, and material omissions. The Company will face substantial costs in connection with that lawsuit.

31

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

71.    As a direct and proximate result of the Doe Defendants and the Individual Defendants' actions as alleged above, MannKind's market capitalization has been substantially damaged.

72.    Further, as a direct and proximate result of the Doe Defendants and the Individual Defendants' conduct, MannKind has expended and will continue to expend significant sums of money, including:

(a)    costs incurred in investigating and defending MannKind and certain officers and directors in the class action lawsuit, plus potential hundreds of millions of dollars in settlement or to satisfy an adverse judgment; and

(b)    costs incurred from the loss of the Company's customers' confidence in MannKind's products.

73.    Moreover, these actions have irreparably damaged MannKind's corporate image and goodwill. For at least the foreseeable future, MannKind will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that MannKind's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## X.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

74.    Plaintiff brings this action derivatively in the right and for the benefit of MannKind to redress injuries suffered, and to be suffered, by MannKind as a direct result of breaches of fiduciary duty, abuse of control, gross mismanagement, and insider selling, as well as the aiding and abetting thereof, by the Individual Defendants. MannKind is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

75.    Plaintiff will adequately and fairly represent the interests of MannKind in enforcing and prosecuting its rights.

///

32

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

76.    Plaintiff was a shareholder of MannKind at the time of the wrongdoing of which Plaintiff complains and has continuously held stock in the Company at all relevant times.

77.    The Board of MannKind currently consists of the following nine individuals: Cohen, Consiglio, Friedman, Kresa, MacCallum, Nordhoff, Shannon, Mann, and Edstrom.

## A.    Demand Is Futile As To Defendant Mann

78.    Defendant Mann faces a substantial likelihood of liability for his individual misconduct. Mann is a named defendant in one or more federal class actions pending in the Central District of California alleging that he and the Company violated §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 when he disseminated or approved false statements.

79.    If Defendant Mann pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws. This, in turn, would impair the defense of the class action and greatly increase the probability of Defendant Mann's personal liability in the class action. As such, Defendant Mann is fatally conflicted, and therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims. Thus, demand is futile as to Defendant Mann.

80.    Additionally, Defendant Mann is not independent because he is the founder, Chairman of the Board, and Chief Executive Officer of MannKind. Defendant Mann is also a majority shareholder. As of April 2010, Defendant Mann controlled 50,380,991 shares, or 44.5% of the outstanding common stock. According to relevant portions of the Company's 2010 proxy statement, Defendant Mann is not independent under applicable NASDAQ rules. Thus, the Individual Defendants concede that Defendant Mann cannot independently consider a demand.

81.    Further, Defendant Mann is not disinterested because he faces a substantial likelihood of liability for issuing the false and misleading statements. Defendant Mann

33

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    knew that (1) the Company failed to disclose that the FDA had issues with the clinical

2    utility of AFREZZA which might inhibit approval; (2) AFREZZA was a riskier product

3    than investors were led to believe and would require additional risk disclosure to patients

4    if approved; (3) the reasons for the FDA's earlier delay in approval were not limited to

5    the inspection of the European facility; and (4) given these factors, it was highly

6    doubtful that FDA approval would be forthcoming.  Accordingly, Defendant Mann

7    breached his fiduciary duty to MannKind shareholders for withholding material

8    information and disseminating false and misleading statements.  Since he faces a

9    substantial likelihood of liability, he cannot disinterestedly consider a demand.

10        **B.    Demand Is Futile As To Defendant Edstrom**

11        82.    Defendant Edstrom faces a substantial likelihood of liability for his

12    individual misconduct.  Edstrom is a named defendant in one or more federal class

13    actions pending in the Central District of California alleging that he and the Company

14    violated §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 when he

15    disseminated or approved false statements.

16        83.    If Defendant Edstrom pursued these derivative claims, then that would

17    expose his own misconduct in the class action for violations of the federal securities

18    laws. This, in turn, would impair the defense of the class action and greatly increase the

19    probability of Defendant Edstrom's personal liability in the class action.  As such,

20    Defendant Edstrom is fatally conflicted, and therefore, unable to render a disinterested

21    decision as to whether the Company should pursue these derivative claims.  Thus,

22    demand is futile as to Defendant Edstrom.

23        84.    Additionally, Defendant Edstrom is not independent because he is the

24    President and Chief Operating Officer of the Company.  According to relevant portions

25    of the Company's 2010 proxy statement, Defendant Edstrom is not independent under

26    applicable NASDAQ rules.  Thus, the Individual Defendants concede that Defendant

27    Edstrom cannot independently consider a demand.

28    / / /

34

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

85.    Further, Defendant Edstrom is not disinterested because he faces a substantial likelihood of liability for issuing the false and misleading statements. Defendant Edstrom knew that (1) the Company failed to disclose that the FDA had issues with the clinical utility of AFREZZA which might inhibit approval; (2) AFREZZA was a riskier product than investors were led to believe and would require additional risk disclosure to patients if approved; (3) the reasons for the FDA's earlier delay in approval were not limited to the inspection of the European facility; and (4) given these factors, it was highly doubtful that FDA approval would be forthcoming. Accordingly, Defendant Edstrom breached his fiduciary duty to MannKind shareholders for withholding material information and disseminating false and misleading statements. Since he faces a substantial likelihood of liability, he cannot disinterestedly consider a demand.

C.    **Demand Is Futile Because The Entire Board Is Beholden To Mann And Cannot Independently Consider A Demand**

86.    As detailed above in ¶¶78 - 81, Defendant Mann is an interested director.

87.    The Board cannot independently consider a demand to bring suit against Defendant Mann because he is the founder, Chief Executive Officer, majority shareholder, and controls the Board. Defendant Mann has been a director since April 1999, the Chairman of the Board since December 2001, and the Chief Executive Officer since October 2003. Defendant Mann has effectively controlled the Company on a day-to-day basis via his position as a majority shareholder, Chief Executive Officer, and Chairman of the Board.

88.    Specifically illustrative of his control over the Board, as of April 2010, Defendant Mann controlled 44.5% of the Company, or roughly 51 million shares of MannKind stock. Because of his significant holdings in the Company, Defendant Mann has a stranglehold on the operations of the Company.

89.    Defendant Mann could easily vote any dissenting Board member out of office at the next election if a Board member voted to initiate suit against him. No

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  MannKind Board member has the ability to outvote Defendant Mann. As of April 2010,
2  Edstrom owned 433,319 shares, Cohen owned 64,432 shares, Consiglio owned 94,721
3  shares, Friedman owned 94,721 shares, Kresa owned 137,821 shares, MacCallum owned
4  88,887 shares, Nordhoff owned 77,221 shares, and Shannon owned 0 shares.
5  Collectively, Defendants Edstrom, Cohen, Consiglio, Friedman, Kresa, MacCallum,
6  Nordhoff, and Shannon owned 991,122 shares, which pales in comparison to the 51
7  million shares owned by Defendant Mann.  Thus, Defendants Edstrom, Cohen,
8  Consiglio, Friedman, Kresa, MacCallum, Nordhoff, and Shannon have no voting power
9  to elect directors.  They heavily rely on Defendant Mann for votes in all director
10 elections.  Consequently, Defendants Edstrom, Cohen, Consiglio, Friedman, Kresa,
11 MacCallum, Nordhoff, and Shannon cannot exercise independent business judgment in
12 deciding whether to bring suit against Defendant Mann.

13      **D.    Demand Is Futile As To The Audit Committee Defendants**
              **Consiglio, MacCallum, and Nordhoff**
14

15      90.    Defendants Consiglio, MacCallum, and Nordhoff were responsible under
16 the Audit Committee charter for reviewing and approving quarterly and annual financial
17 statements, earnings press releases, and MannKind's internal controls over financial
18 reporting. Despite these duties, the Audit Committee Defendants allowed the Individual
19 Defendants to issue false statements that failed to disclose that: (1) the FDA had issues
20 with the clinical utility of AFREZZA which might inhibit approval; (2) AFREZZA was
21 a riskier product than investors were led to believe and would require additional risk
22 disclosure to patients if approved; (3) the reasons for the FDA's earlier delay in approval
23 were not limited to the inspection of the European facility; and (4) given these factors, it
24 was highly doubtful that FDA approval would be forthcoming.

25      91.    As a result of (a) their access to and review of internal corporate documents;
26 (b) conversations and connections with other corporate officers, employees and
27 directors; and (c) attendance at management and Board meetings, each of the Audit
28 Committee Defendants knew the adverse non-public information regarding MannKind's

36

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  business, operations, and management.    Indeed, each of the Audit Committee
2  Defendants knew of the wrongdoing complained herein. Thus, each Audit Committee
3  Defendant faces a sufficiently substantial likelihood of liability for their breaches of
4  fiduciary duties, rendering any demand upon them futile.

5      92.    Defendants Consiglio, MacCallum, and Nordhoff authorized and/or
6  permitted the false statements disseminated directly to the public or made directly to
7  securities analysts and which were made available and distributed to shareholders,
8  authorized and/or permitted the issuance of various improper statements and are
9  principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and
10 fully prosecute such a suit even if such suit was instituted by them. Thus, they face a
11 sufficiently substantial likelihood of liability for their breach of fiduciary duties,
12 rendering any demand upon them futile.

13     **E.    Demand Is Futile As To All Of The Director Defendants For
           Additional Reasons**
14

15     93.    MannKind is a biopharmaceutical company focused on the delivery,
16 development, and commercialization of therapeutic products for diseases such as
17 diabetes and cancer. The Company's stock traded largely on the prospects of its lead
18 product candidate, AFREZZA.    Thus, AFREZZA represented the Company's core
19 product or business. Indeed, when the information at issue pertains to a company's core
20 business or service, as it does here, knowledge of that information may be imputed to the
21 entire board through inference as a matter of law. Thus, each of the members of the
22 MannKind Board are charged with having knowledge of the issues described herein
23 related to the Company's false and misleading statements related to AFREZZA.

24     94.    The Director Defendants, as members of the MannKind Board, each knew,
25 failed to act in the face of a known duty to act, and/or were grossly negligent when they
26 allowed the Company to issue statements that failed to disclose that: (1) the FDA had
27 issues with the clinical utility of AFREZZA which might inhibit approval; (2)
28 AFREZZA was a riskier product than investors were led to believe and would require

37

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   additional risk disclosure to patients if approved; (3) the reasons for the FDA's earlier

2   delay in approval were not limited to the inspection of the European facility; and (4)

3   given these factors, it was highly doubtful that FDA approval would be forthcoming.

4   Thus, demand is futile as to the Director Defendants.

5        95.    The Director Defendants, as members of the MannKind Board, each had a

6   duty to ensure that reliable systems of financial controls and reporting were in place at

7   the Company and functioning properly. MannKind, however, did not accurately report

8   the status of the FDA's review of AFREZZA. The Director Defendants each knew,

9   failed to act in the face of a known duty to act, and/or with gross negligence ignored the

10  fact that the Company lacked adequate internal controls. Despite this, the Director

11  Defendants took no steps to avert or correct the situation. The Company's lack of

12  adequate internal controls allowed the materially false and misleading information

13  regarding the Company's financial reporting to be disseminated to the investing public.

14  Thus, the Director Defendants are each subject to a substantial likelihood of liability.

15  Thus, demand is futile as to the Director Defendants.

16       96.    If MannKind's officers and directors are protected against personal liability

17  for their acts of mismanagement, abuse of control and breach of fiduciary duties alleged

18  in this Complaint by Directors and Officers Liability Insurance ("D&O Insurance), they

19  caused the Company to purchase that insurance for their protection with corporate funds,

20  *i.e.*, monies belonging to the shareholders. However, Plaintiff is informed and believes

21  that the D&O Insurance policies covering the Individual Defendants in this case contain

22  provisions that eliminate coverage for any action brought directly by MannKind against

23  the Individual Defendants, known as the "insured versus insured exclusion." As a result,

24  if the Director Defendants were to sue themselves or certain of the officers of

25  MannKind, there would be no D&O Insurance protection, and thus, this is a further

26  reason why they will not bring such a suit. On the other hand, if the suit is brought

27  derivatively, as this action is brought, such insurance coverage exists and will provide a

28  basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

be expected to file a derivative lawsuit because such a claim might not be covered under the Company's D&O insurance policy.

97.     Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting MannKind by prosecuting this action.  Therefore, demand on MannKind and its Board is futile and is excused.

98.     MannKind has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

99.     A true and correct copy of this Complaint was delivered to MannKind before it was filed with the Court.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

100.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.    Defendants owed and owe MannKind fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe MannKind the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

102.    Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

103.    Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the FDA's review of AFREZZA.  These actions could not have been a good

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  faith exercise of prudent business judgment to protect and promote the Company's

2  corporate interests.

3      104.  As a direct and proximate result of Defendants' failure to perform their

4  fiduciary obligations, MannKind has sustained significant damages.  As a result of the

5  misconduct alleged herein, these Defendants are liable to the Company.

6      105.  Plaintiff, on behalf of MannKind, has no adequate remedy at law.

7                          **COUNT II**

8  **Against Defendant Pfeffer for Breach of Fiduciary Duty for Insider Selling and**
**Misappropriation of Information**

9

10     106.  Plaintiff incorporates by reference and realleges each and every allegation

11  contained above, as though fully set forth herein.

12     107.  At the time Defendant Pfeffer sold his MannKind stock, he knew the

13  information described above, and sold MannKind stock on the basis of such information.

14     108.  The information described above was proprietary non-public information

15  concerning the Company's financial condition and future business prospects.  It was a

16  proprietary asset belonging to the Company, which Defendant Pfeffer used for his own

17  benefit when he sold MannKind stock.

18     109.  At the time of his stock sales, Defendant Pfeffer knew that MannKind had

19  received the FDA notice but had not yet disclosed the notice to the public.  Defendant

20  Pfeffer's sales of MannKind stock while in possession and control of this material

21  adverse, non-public information was a breach of his fiduciary duty of loyalty and good

22  faith.

23     110.  Since the use of the Company's proprietary information for his own gain

24  constitutes a breach of Defendant Pfeffer's fiduciary duties, the Company is entitled to

25  the imposition of a constructive trust on any profits he obtained thereby.

26     111.  Plaintiff, on behalf of MannKind, has no adequate remedy at law.

27  **XI.    PRAYER FOR RELIEF**

28      WHEREFORE, Plaintiff demands judgment as follows:

                          40

             VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    A.    Against all the Individual Defendants for the amount of damages sustained

2  by the Company as a result of the Individual Defendants' breaches of fiduciary duties,

3  and aiding and abetting breaches of fiduciary duty;

4    B.    Directing MannKind to take all necessary actions to reform and improve its

5  corporate governance and internal procedures to comply with applicable laws and to

6  protect MannKind and its shareholders from a repeat of the damaging events described

7  herein, including, but not limited to, putting forward for shareholder vote resolutions for

8  amendments to the Company's By-Laws or Articles of Incorporation and taking such

9  other action as may be necessary to place before shareholders for a vote the following

10  Corporate Governance Policies:

11         •    a proposal to strengthen the Board's supervision of the
12              FDA's approval process for new products;

13
14         •    a proposal to strengthen internal controls and policies
15              concerning the FDA's approval process for new products;

16         •    a proposal to strengthen the Board's supervision of
17              operations and develop and implement procedures for
18              greater shareholder input into the policies and guidelines of
19              the Board;

20
21         •    a provision to permit the shareholders of MannKind to
22              nominate at least two candidates for election to the Board;

23         •    a proposal to ensure the accuracy of the qualifications of
24              MannKind's directors, executives and other employees;

25
26         •    a proposal to strengthen the Company's procedures for the
27              receipt, retention and treatment of complaints received by

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1     the Company regarding accounting, internal controls and

2     auditing matters; and

3

4      • a provision to appropriately test and then strengthen the

       internal audit and control functions;

5

6   C. Awarding to MannKind restitution from the Individual Defendants, and

7 each of them, and ordering disgorgement of all profits, benefits and other compensation

8 obtained by the Individual Defendants;

9   D. Awarding to Plaintiff the costs and disbursements of the action, including

10 reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

11   E. Granting such other and further relief as the Court deems just and proper.

12 **XII. JURY DEMAND**

13   Plaintiff demands a trial by jury.

14

15 DATED: June 17, 2011     PACIFIC COAST LAW GROUP
               MARK A. GOLOVACH (220760)

16

17             /s/ Mark A. Golovach

18             MARK A. GOLOVACH

19           555 West 5th Street, 31st Floor
           Los Angeles, California 90013
20           Telephone: 310/684-3966
           Facsimile: 310/460-0078

21           *Attorneys for Plaintiff*

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT